The next matter for argument today is Eidem v. Eidem, 1914-17. Thank you. Thank you, Judge Carney. May it please the Court, Charles Dewey Cole for the appellant, Dan and Marie Eidem. The difficulty with the procedure followed in the district court was that, having tried the case using declarations as a substitute for the direct evidence, that after the trial had concluded, the district court, in a perfectly responsible way of following what had been going on, particularly with the oldest child, ended up relying on a lot of the material that was sent to the court that was never subject to cross-examination. It was simply out-of-court statements in reaching the decision in the case. The motivating issue in the case and what was really at trial in the district court was whether the children, and particularly the oldest child, T.E., who had this gastrointestinal disease called Hirschsprung's disease, would be under a grave risk of harm, either physical or psychological, if returned to Norway. What was also clear from the district court's very good questioning of the Petitioner was that the Petitioner, the father, had not made any effort at all at the time of the trial to take care of the oldest child's medical needs, not having investigated what might be available there. We knew that he had been subject to a surgery that had failed in Norway for his Hirschsprung's disease, and he was, of course, now getting treatment here in the States. But he had not followed up on that, nor had he followed up on any sort of psychotherapy, and both children were, at least here in the States, under the care of a psychotherapist. It's your client's burden to establish grave risk of harm, right? Exactly right. And it's a big burden because it's clear and convincing evidence. That's right. So it's a very heavy burden to carry. And looking at the evidence that was adduced, even without regard to the post-trial submissions, I had difficulty identifying the evidence that showed that the children would be at such a grave risk, that they could not get adequate medical care, both psychological and of other kinds related to the Hirschsprung's disease in Norway. Could you show me how your client established that? Well, let me suggest this, that her principal proof was that he had, the oldest child, T.E., had already undergone surgery for Hirschsprung's disease, and it had failed, and that he still wasn't cured. And that was, I, although it really didn't come out, I think that was the motivating reason why she brought the children to New York. Certainly, from that fact alone, having tried to get treatment there for Hirschsprung's disease and not being successful, that was a part of it. But then, understand, remember what the district court said, because the district court has the advantage of all of us of having been there. And remember, the district judge says, I have no doubt that there was grave physical harm and psychological harm that would flow from a precipitous return to Norway. Point being, yeah, right now, I've already asked the petitioner, do you have any plans for the children's medical care? Well, I haven't made any. Do you have any plans for therapy? I haven't done that either. He says a precipitous return, so he was looking at, are they going tomorrow? Of course. A planned return. Of course. And again, I'm having difficulty looking at the record and seeing how your client showed by clear and convincing evidence that there would be such a grave risk. In our Italian case, we had domestic violence. That was established and that was shown by clear and convincing evidence, and as to which there was little doubt that that would continue were the children returned to Italy. And again, I don't see evidence here that the Norwegian medical system is unable to deliver adequate care. It doesn't have to be maybe as fine as some of the finest hospitals in New York. But to show grave risk, that's an exception to the strong principle under the Hague Convention that the place of habitual residence is the place where the children belong. So I need you to, I'm interested in hearing where she established that the hospitals in Norway are unable to provide adequate care. There was the expert proof that she brought in, which was Dr. Paul, who basically said, look, you know, he's getting the care here. This is where he should stay, and if he goes back now, it would most likely be a problem. Mind you, I will grant you that Dr. Paul doesn't practice in Norway. I appreciate that, and that's one of the difficulties here. She can say, well, he didn't get good care there when he was there. He's getting good care here. There's no reason to think that that situation would change. And the district court's view was, at least at the conclusion of the trial, that if he were returned then, it would be a problem. Now, I grant you, Your Honor, that the district court might have room to say, well, all right, now that a year has gone by or some other period of time has gone by, that maybe you wouldn't be able to prove up your case now. But at least when the case was tried, the point that the district court made was, well, you can't go back now because now you've certainly proved your risk. Because remember, the district court says, I have no doubt. That's not beyond a reasonable doubt. That's not clearly convincing. That's no doubt that he goes back now. So then the question is, all right, what changes? Sotomayor, didn't the father agree that TE could remain in the United States until after surgery and a period of recuperation? Exactly right, Your Honor. But my point is, and this is where I kind of want to drop a footnote, is that, you know, that still becomes a disputed issue of fact, which is entitled to be tried. And whether at some later point, the grave risk goes away. In other words, the district court said, I've been reading these letters that I've gotten from the people in Norway. I got a letter from a doctor who says the care here is adequate. I'll rely on that. Our point is that, well, you can do that, but that would have to be after an evidentiary hearing after a trial, not just, well, let's collect some stuff and rely on it. What evidence did you deduce that Norwegian hospitals can't treat this disease? It was If they had one complicated surgery, that happens here all the time as well. Of course. So what did you point to? The only proof they had was Dr. Paul's proof, who said he's getting good care here. He can't testify to what it's like in Norway, except it's not the same care he's getting here, and it would be bad for him to leave the care he's getting now. That was his proof. Continuity of care. Well, that was it. And that was what the Is that equivalent to grave risk of harm? I'm not suggesting for a moment, Your Honor, that the situation might not change. But at least at the end of the trial, the district court had no doubt that there was a grave risk of harm, that the children were returned, and the district courts were persevering. I see my time. Thank you very much. You have two minutes of rebuttal, Mr. Cole. Mr. Gorbitz, please. May it please the Court. My name is Ari Gorbitz, and I represent the petitioner, Peli, a father whose children have been retained wrongfully in the United States for approximately 960 days since they were supposed to be returned in July of 2018. I think Your Honor has it correct. There was no proof adduced at the time of trial with regard to grave risk of harm. Let me ask, though, you know, the father had made no plans, as the Court noted. And he has two children who would be returning to his care, one of whom has a serious gastrointestinal condition that requires daily care and repeated surgeries and so on. Both of the children are young and have acute psychological needs. If they were to receive no care because no plans had been made, why wouldn't that put them at grave risk of harm? First, when they left Norway, the child was diagnosed almost immediately after birth with this condition. When the children came here, which I believe was in July of 2016, okay, they received no care here for months on end. The condition became apparent, or we became aware of the condition, upon the filing of the complaint in this matter and all the surgeries that were going to be taken. And we didn't even know that there was an additional pull-through surgery until some point in time in the litigation. I'm sorry. What about the allegation that the first surgery that was done in Norway failed? That was — well, we don't know whether it failed or not. There was testimony from Dr. Rot that there was a problem with the surgery. I don't remember his exact wordings that he utilized. I don't know if I could say that it failed. There was some thought by Petitioner, as well as Dr. Bjørlund's team in Norway, that because the child was not getting the necessary treatment by the mother while they were here for that year period of time, that that could have caused something. There was no definitive determination by anyone, let alone one of the experts. And that was actually a comment by Dr. Fisher, who wasn't called to testify at the time of trial, that that is a possibility. But still, with the father saying that he had made no plans, why wouldn't it be reasonable to conclude, based on the — you know, excluding the post-submission, post-trial submissions, that it would put the children at grave risk of harm because they both needed care? That was unclear — that was clear that they both needed care, wasn't it? They needed some form of care, but whether that harm, quote, has gravity to satisfy a 13B exception, we — I mean, the courts have determined that returning to a war-torn country, returning to a physical or abusive environment, or returning to essentially the scene of the crime that was going to exacerbate trauma that was experienced through a trial, really satisfies the 13B exception. We don't have that here. Your Honor referenced Ermini v. Vittori, which was a precedential — a seminal case where it took psychological harm and determined, number one, that there was domestic violence, and that the child being returned to Italy would not only result in trauma being re-inflicted upon the child, you also had, in that case, the daughter testifying about the domestic violence. You had, in that case, the petitioner father admitting before a New York state court in an order of protection about the domestic violence. And then you had autism, and PTN essentially not more than regression. The child wasn't advancing at a steady pace. In this case, we have none of those facts. There's no autism. There's no domestic violence. The kids have some learning disabilities, and we have a medical condition. If we look at the medical condition alone, you know, there's very — there's a dearth of law out there with regards to, can a medical condition alone, absent PTSD, autism, abuse, satisfy a 13B exception? And the answer seems to be, the majority is no, unless the Respondent proves, by clear and convincing evidence, that the home country is incapable of caring for the children. I think the one case in the country, really, that sets out an actual test for it, is Queller v. Joyce, and Queller v. Joyce sets out a test with regards to a medical condition, whether the children's return would disrupt an ongoing course of treatment and severely impact the child's health. So there was testimony that it would affect the course of treatment, and it seems to have influenced the district court in his decision not to move very quickly in entering this order and requiring the children be returned. There was surgery on the horizon. There was testimony about general disruption. And, I mean, the procedure that was followed was a little unusual, I guess, though perhaps tailored to the family's circumstances. Could you address that? Wasn't your adversary prejudiced by having a hearing and then the district court relying on these post-trial submissions that maybe they didn't have a chance to rebut adequately? I don't think my adversary was prejudiced, and I really don't think that, being there at the time of trial, I don't think that the trial court relied upon that post-trial submissions. The judge didn't want to precipitously return the children. I think at the time of trial, there was a finding, or if you were to measure it in time frames, you know, from the point of trial prior, I don't think the court was determined that there was a grave risk of harm. I believe that the judge was compassionate. I think that he was concerned. He even made notes that our client agreed to it at the time of trial to do the surgery here rather than returning the child home because everyone cared for these children, number one. Number two, he was concerned about their well-being. Now, whether that harm of having the surgery done here versus having the surgery done in Norway would rise to the level of a grave risk of harm, exception under 13, is a different story. Right now, all we're talking about is aftercare. And the judge, without explicitly stating it, I believe, was putting forth certain undertakings without finding a 13B exception, which he's allowed to do, which is basically ensuring that a grave risk of harm will not occur based upon a precipitous return. Could there be – could there have been harm to the child returning immediately? Yes. Did it rise to the level of a grave risk of harm as envisioned by the directors of the convention and as outlined in the official comments – I forgot her name – Pesvera, who's the – you know, that's considered, I wouldn't say precedential, but an authoritative voice? I don't think it did. I think that the judge was just simply concerned, as we all were, counsel, petitioner, respondent, that a precipitous return to Norway had to be prevented. And I think the judge did that also by extending the delay, or making it a delay, to return after the school year with regards to the schooling, getting them settled, et cetera. The fact of the matter is that there was no evidence presented by the Respondent with regards to any care of treatment in Norway. In fact, their own expert, when asked in cross-examination, Dr. Paul, did he review – and I believe it was Dr. Rotz also – did he review any documentation from Norway? The answer was no. And Dr. Paul was asked, what do you think about Dr. Jorlund and her team in Norway? And she said she's competent. So being competent doesn't correlate to being incapable of doing it. And I think Judge Sullivan was very astute to this. I think that he also framed the issue perfectly, which is – it's not the question, it's not whether we think New York is the best or the United States is the best care. It's whether that Norway's facilities or capabilities are so inadequate as to cause a great risk to Parliament. Can I just follow up on a question? I'm not sure if I missed it, but what was your basis for saying that there was no prejudice based on the district court's acceptance of post-hearing submissions? That the Respondent didn't have the opportunity to – or the Petitioner didn't have the opportunity to cross-examine and test in a normal evidentiary way? There was nothing really to test, in my opinion. And I think that the Judge did not rely upon those post-judgment submissions on an evidentiary basis. He already determined that there's been no evidence put forth as Respondent's burden to prove by clear and convincing evidence a great risk of harm. If anything, the Judge really relied upon Dr. Fisher's, if he relied upon anything, letter where it says, oh, no, the surgery went well, he's safe to fly. I don't think that they were prejudiced in any shape, manner, or form. They never – I don't think in any of the papers or any of the pleadings or any of the testimony there was anything advanced that Norway was incapable of caring for these children. All right, thank you. Thank you. Mr. Cole, you have two minutes. I know, and they go very quickly, Your Honor. Let me try to look at it another way, and that is if, as you say, Your Honor, that there was no proof then of it being a great risk of harm, then it follows, I think, that the district court would have pre-terminated the case right then at the end of the trial, made his findings on the record, entered a judgment, and that's the end of it. The point of it was that the district court obviously had this concern that sending the children to Norway certainly right away, and maybe forever, would in fact be a grave risk to them. And think about it this way. If that finding comes up here, and the district court having made that, that comes up under Rule 52 standard where you'd have to say the district court was clearly erroneous, though it's a definite and firm conviction that a mistake was made. And I don't think the record fairly you can say that, considering that the district court is the one who heard the evidence. And, of course, there's the other issue, too, and that was that what had concerned the district court was that the hospital, the hospital in Trinidad, which was the closest hospital for care, was some 4 hours away, and Judge Fisher or not Judge Fisher, Dr. Fisher had made the point that, you know, he was later on that he was going to need this continual irrigation. When Your Honor says that the procedure followed by the district court was a little unusual, I think that's being very modest about it. The case kind of reminds me about the one that Judge Park had last week that came out about the LLC corporations and whether the diversity. You know, what happens in the district court is sometimes we forget to follow the rules as carefully as we should, and we say, oh, sure, there must be diversity  Well, you know, there are rules that govern the way we're supposed to try cases. We don't just send in a bunch of stuff. It's fair enough to send in that stuff for the district court. But your adversary's position is that the district court was inclined to rule the way it did and didn't want to act precipitously and therefore solicited post-hearing submissions to make sure that it was acting prudently. Right. What's your response to that? And if the district court hadn't cited that material in its decision and hadn't relied on it, you could say, as I think I said in the reply brief, it's all harmless. It doesn't make a difference. The point of it is it did rely on it. I mean, think about it this way. Imagine you're at trial and the question comes up, well, is the medical care adequate? So the lawyer reaches into his bag and he pulls out a letter from a physician in Norway and says, oh, we have adequate medical care. I'll put this letter in evidence. We don't do it that way. That's the vice here, Your Honor. That's the vice. Thank you. I think we have the arguments. It helps out. We'll take back your submission and try to get you a decision promptly. Thank you.